RENDERED: NOVEMBER 21, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0945-MR

JOHN GREGORY JONES AND                                              APPELLANTS
SOUTHERN GARDENS, INC.


                          APPEAL FROM LAUREL CIRCUIT COURT
v.               HONORABLE MICHAEL O. CAPERTON, JUDGE
                          ACTION NO. 19-CI-00712



DAVID McCREARY, D/B/A                                                  APPELLEES
SOUTHEAST AUTO & TRUCK
REPAIR AND JASON McCREARY,
D/B/A SOUTHEAST AUTO &
TRUCK REPAIR


OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, ECKERLE, AND McNEILL, JUDGES.

CALDWELL, JUDGE: John Gregory Jones ("Jones") and Southern Gardens, Inc.,

appeal the February 16, 2024, judgment of the Laurel Circuit Court, based upon a

jury verdict finding no liability as to claims against Appellees but awarding

damages against Jones in the amount of $102,810.15. We affirm.

# BACKGROUND

This case arises from a dispute related to restoration services for a collection of antique and classic cars, as well as maintenance services for some work trucks. Jones is the owner of the car collection, as well as the operator of Southern Gardens, Inc. ("Southern Gardens"), a landscaping and lawn maintenance business in Nashville, Tennessee. David and Jason McCreary ("the McCrearys") are a father and son doing business as Southeast Auto and Truck Repair, who together operate an automotive garage in London, Kentucky. For a number of years, beginning no later than 2008, the McCrearys provided repair and restoration services for dozens of vehicles owned by Jones. Additionally, they provided some maintenance services on work trucks that Jones used for Southern Gardens.

After more than a decade, the relationship between the parties began to sour before ending entirely. While the reasons for the breakdown are disputed, the parties agree that the relationship ended entirely in August of 2019. During this same month, the McCrearys filed a Mechanics Lien with the Laurel County Clerk. Therein, it was alleged that Jones owed a total sum of $88,200.00 for work performed and for the storage of his vehicles. The lien listed six automobiles which had been detained upon which the alleged unpaid work had been performed: a 1942 Ford SDX, a 1954 Hudson Wasp, a 1957 Chevrolet Bel Air, a 1958 Chevrolet Impala, a 1965 Chevrolet Malibu SS, and a 1965 Chevrolet Impala

Convertible. The lien did not contain any itemization that alleged what portion of the total was attributable to labor performed on any of these particular vehicles, however. Neither did it indicate what portion of the total was attributable to the claimed storage.[1]

Soon after he received notice of the Mechanic's Lien, Jones filed suit against the McCrearys in Laurel Circuit Court for causes of action including Illegal Lien, Trespass to Chattels, Conversion, Slander of Title, Breach of Contract, and requesting Punitive Damages. Following a long period of discovery and pretrial litigation, a five-day jury trial began on September 23, 2023.

At trial, Jones testified he had first sought out the services of David McCreary when he inherited some antique cars that had belonged to his father. Jones was aware David McCreary had previously worked on the cars and estimated that he first took one of these vehicles back to the McCrearys for restoration and repair in 2008. From there, Jones testified, a business relationship and friendship with David McCreary developed, and Jones's enthusiasm for classic cars grew. Jones began to acquire a number of other vehicles and quickly became the McCrearys' primary customer. He testified he had traveled with David

---

[1] An Amended Mechanics Lien was later filed and listed additional vehicles, as well as numerous parts and engines for antique cars that had been detained in storage. However, this document also contained no itemizations or breakdown beyond the total amount alleged.

McCreary to car shows and considered him a close friend. He testified he was largely happy for several years with the services the McCrearys provided.

Jones testified that he had agreed to a rate of $30.00 per hour for each laborer working on his cars at the McCrearys' garage. He kept in close contact by telephone with David McCreary and would often speak with him daily to keep updated on the progress and work being performed on his cars. Jones testified that he would travel to the garage from Nashville several times a year to visit, and observe the work being performed on his vehicles.

Jones produced evidence of a long history of payments he had made to the McCrearys. Describing the customary billing process between the parties, Jones testified that during his telephone conversations with David McCreary he would periodically receive a request for payment. Jones said that he would send a check for the requested amount on the day of the request or the following day.

When asked why he never received written invoices, Jones testified that he had unsuccessfully requested written invoices on many occasions over the years. Jones alleged that he had eventually concluded that David McCreary was not "academically able" to put together a written invoice and accepted the arrangement. Jones testified that he trusted David McCreary during the entirety of their relationship and had never second-guessed his billing. Prior to litigation, Jones testified, he had never seen anything on paper kept by McCreary tracking the

labor from the garage or his own payment history. Furthermore, Jones testified, he had been current on every payment requested during the time the Mechanics Lien was filed. Jones alleged the Mechanics Lien had been baselessly filed in retaliation for his decision to no longer use the services of the McCrearys.

According to Jones's testimony, an initial source of strain in the parties' relationship occurred when the rate and quality of the McCrearys' work deteriorated. He attributed some of this to Jason McCreary's becoming more involved in the management of the garage and David McCreary's having less oversight. Additionally, Jones testified that he became dissatisfied with storage fees he was being charged.

Jones complained that he had felt pressured by David McCreary when Jones had initially agreed to the payment arrangement—an arrangement whereby Jones paid $850 per month for the storage of a number of cars and parts he had brought the McCrearys which were not being currently worked on in their garage. As the work on his cars in the garage slowed, Jones described he became more dissatisfied that he would continue to incur costs for cars in storage which would not soon be restored. Jones testified that his near daily telephone conversations with David McCreary eventually consisted mostly of his begging McCreary to resume working on his cars. He testified that he eventually told McCreary that if

the garage could not finish the cars quickly, he did not want to continue keeping his other cars in storage and incurring the fees.

Jones testified that nothing changed. Jones alleged he eventually became so dissatisfied with the storage arrangement and the quality of work that he told the McCrearys that he planned to retrieve all of his cars and asked that they cease any further work for him. It was immediately following this, Jones testified, that the McCrearys had filed the Mechanics Lien, despite his being current on all requested bills and storage fees.

After the lien was filed, Jones testified, he began taking his cars to another mechanic. Jones alleged that he began to discover serious mechanical issues with vehicles which had been serviced by the McCrearys. A mechanic who provided services to Jones testified about repair and restorations he had made. He criticized the quality of some work to Jones's vehicles allegedly provided by the McCrearys. Jones alleged damages which totaled approximately $1.5 million.

The McCrearys' testimony described an entirely different history and a different source of the breakdown in the relationship. They testified that Jones expressed no serious complaints with their work for more than ten years. Jason McCreary provided testimony describing their work on vehicles acquired by Jones. This work required total rebuilding and meticulous restoration before being the finished "show cars" in photographs presented to the jury. Some photographs were

taken at car shows where Jones had entered the vehicles. The McCrearys maintained that all of their work had been consistently performed to a high standard and pointed out Jones himself had proudly displayed their restorations at car shows.

Jason McCreary testified that their work had been of a consistent high quality. He testified that he had periodically traveled to Nashville to service Jones's vehicles there, typically to provide maintenance to his collection. When questioned about text messages from Jones that requested the McCrearys' address a problem on a finished car, Jason McCreary testified these had not been a result of mechanical errors or poor work from his garage. Typically, he testified, these were also occasions when it had been a number of months or more before Jones had gotten around to starting and driving a vehicle. Jason McCreary described a number of common mechanical problems and maintenance issues that occurred under these conditions that he had performed on several of these occasions. Regarding the mechanic work to the cars after litigation began, the McCrearys testified that many of Jones's complaints were about parts in cars that Jones had in his possession for many years and for which he had never previously requested mechanic work.

Regarding the billing practices, the McCrearys testified that, at the beginning of the parties' relationship, they *had* presented Jones with written

invoices for their services.  Furthermore, according to the McCrearys, it was Jones who had requested that all billing take place by telephone.  Later, they testified, Jones requested blank invoices from the garage that he could detail and itemize himself.

**Documents Exchanged During Discovery**

A prominent subject in dispute at trial concerned documents which had been received in discovery and the circumstances surrounding their creation.

1.  The Original Notebook

David McCreary testified that he had recorded his bookkeeping for the garage, including all of Jones's delinquent bills, in a notebook that detailed his billing for customers from the beginning of the year 2017.[2]  The notebook did not utilize a formal accounting system and was not overly detailed.  There were weekly entries for each customer.  The entries included notations which David McCreary testified represented the amount of labor incurred, as well as costs for parts and supplies.  Many weeks' entries included a notation which David McCreary testified had indicated that a payment had been received and the date the check had arrived.  The notebook did not typically identify the specific automobile(s) on which work had been performed.

---

[2] The McCrearys did not dispute that Jones was current on all payment requests for work from before 2017.

## 2. The Second Notebook

A Second Notebook tendered by the McCrearys reproduced notations from the Original Notebook.  However, it omitted any information regarding customers other than Jones.  Additionally, it omitted some superfluous or scratched notations and had been written more carefully to be more legible.  It reproduced the notations the McCrearys alleged represented the total amounts billed for labor each workweek.  Additionally, it reproduced the notations from the first notebook that indicated if and when payment had been received for the billing.

## 3. The "Invoices"

Initial discovery responses tendered to Jones from the McCrearys referenced attached "Invoices" in multiple responses.  These were written on preprinted invoice sheets with the name and address of the McCrearys' garage and identified Jones or Southern Gardens as the customer.  Most invoices ostensibly detailed weekly labor billed to Jones but, unlike either Notebook, the "Invoices" specified particular cars belonging to Jones in them.  It is undisputed that there are some discrepancies between some amounts in the "Invoices" as compared with the Notebooks.

It is also undisputed that, shortly after their production, counsel for the McCrearys informed counsel for Jones that the "Invoices" had been attached to the discovery responses as a result of inadvertence and error on the part of counsel,

and that any ostensible reference to the "Invoices" in interrogatory responses had likewise been in error. Counsel for the McCrearys said the "Invoices" had resulted from his requesting that the McCrearys put together something that might help him, counsel, have a better understanding as to what work was performed on which cars listed in the Mechanics Lien. It is undisputed that counsel for the McCrearys consistently offered the same explanation from the first discussions of the subject with counsel for Jones.

Counsel maintained that the McCrearys generated the "Invoices" after litigation had begun and the Invoices had been intended as a confidential communication with him. After receiving them, counsel had misplaced them within his case file; this error and inadvertence resulted in a paralegal utilizing the Invoices in preparing the responses and attaching them to the responses to interrogatories.

Counsel explained that, soon after the McCrearys had first engaged his services, he requested a summary of the work for which they had not been paid. He first received David McCreary's notebook. Counsel had found the McCrearys' notebook to be difficult to read and decipher and had requested they provide documentation that broke the work down in a manner he could more easily understand. Counsel noted that he could not decipher what amount was

attributable to each car from the total. This resulted in Jason McCreary generating the "Invoices."

4. Demonstrative Table

Another document which was also at issue throughout much of discovery was a demonstrative table generated by Jones which purported to correct mathematical errors from David McCreary's calculations in the Second Notebook. Jones alleged that, with the mathematical errors corrected, even if the weeks marked as unpaid were calculated against him, the Second Notebook established that he had already overpaid the McCrearys by $82,000.00.

An example calculation concerning the workweek of February 20-24, 2017, is typical of many others where Jones's Demonstrative Table had "corrected" an alleged error of McCrearys. The entry in the Second Notebook for this same week has a column with the handwritten notation "40 hrs" with the number "3600.00" across from it. It is undisputed that the parties agreed to $30.00 per hour per laborer. Jones argued that the notations for this week demonstrate he should have been charged for only a single laborer. Accordingly, Jones's Table indicates this represents a mathematical error whereby he should have been charged only $1,200.00.

Long before trial, David McCreary provided an affidavit explaining the calculations for dates for which Jones complained of being overcharged. For

the week in this example, McCreary swore in the Affidavit, "(t)hree men were assigned to the project for a total of 120 man hours. 3 men x $30.00 per hour x 40 hours = $3,600.00 in labor cost[.]" McCreary restated this explanation during his testimony at trial.

Following the close of evidence, Jones moved the trial court for a directed verdict. Two of the grounds which Jones then alleged were the basis of his motion are central to this appeal. In one, Jones argued for a directed verdict dismissing the McCrearys' claims against him as a sanction for fraudulently creating the "Invoices" and attempting to pass them off as documents which had been sent to Jones and which supported the amount claimed in their Mechanics Lien. In the other, Jones argued that the McCrearys' evidence in support of their claims was wholly insufficient; he maintained the jury would be required to base its verdict on conjecture and guesswork, were it to award the McCrearys any amount. He insisted that the only evidence relied upon by the McCrearys were the notebooks. Furthermore, Jones alleged, once the "mathematical errors" in the notebooks were corrected, this evidence only established that the McCrearys had grossly overcharged him during the relevant period. He requested a directed verdict for his claim that he had overpaid the McCrearys by $82,000.00.

The trial court denied Jones's motion for a directed verdict. Following deliberation, the jury returned a verdict which found Jones had failed to

prove his claims while awarding the McCrearys a total of $102,810.15 for their claims of unpaid work and storage fees. The trial court entered a judgment in accordance with the jury's verdict and reiterating the response to the following instructions:

> INTERROGATORY NO. 1: State whether you are satisfied from the evidence that the defendants McCreary failed to restore or repair any of the plaintiffs' Jones or Southern Gardens vehicles in a competent, workmanlike manner and that plaintiffs suffered monetary damage as a result.
> ANSWER:    NO
>
> INTERROGATORY NO. 2: State whether you are satisfied from the evidence that the defendants McCreary charged the plaintiffs Jones or Southern Gardens for more hours than they actually worked on plaintiffs' cars or for parts that plaintiffs had already paid for.
> ANSWER:    NO
>
> INTERROGATORY NO. 3: With respect to the Mechanics Liens filed by defendant Jason McCreary, state whether you are satisfied from the evidence that the filing of such liens by defendant Jason McCreary was forged, groundless, contained a material misstatement, or was a false claim.
> ANSWER:    NO
>
> INTERROGATORY NO. 5: State whether you are satisfied from the evidence that the plaintiffs Jones and Southern Gardens are indebted to the McCreary defendants for any unpaid labor with respect to the McCrearys' claimed work on plaintiffs' vehicles.
> ANSWER:    YES
>
> If your answer to the above question was yes, then state what sum of money you find will fairly and reasonably

-13-

compensate the defendants McCreary for any sums
which you find to be due and owing to the defendants
McCreary from the plaintiffs (not to exceed $86,650.60).
ANSWER    $85,285.15

INTERROGATORY NO. 6:  State whether you are
satisfied from the evidence that the plaintiffs Jones and
Southern Gardens are indebted to the McCreary
defendants for any unpaid storage with respect to the
McCrearys' claimed work on plaintiffs' vehicles.
ANSWER:   YES

If your answer to the above question was yes, then state
what sum of money you find will fairly and reasonably
compensate the defendants McCreary for any sums
which you find to be due and owing to the defendants
McCreary from the plaintiffs (not to exceed $35,050.00).
ANSWER   $17,525.00

Following the trial court's entry of the judgment against him, Jones

filed a motion for judgment notwithstanding the verdict (JNOV) or, in the

alternative, a new trial. In the motion Jones restated the arguments made in his

motion for a directed verdict.  The trial court denied Jones's motion,  This appeal

follows.  Additional facts will be provided as necessary.

## ANALYSIS

Before we turn to an analysis of the substantive arguments before us,

we must address deficiencies in Appellant's brief.  RAP[3] 32(A)(4) provides that

the argument section of an appellant's opening brief "*shall* contain at the beginning

---

[3] Kentucky Rules of Appellate Procedure.

of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner." *Id.* (emphasis added). Jones's Appellant brief does not comply with this straightforward requirement.

Where an appellant fails to comply with the appellate rules, this Court possesses discretion to follow any of the following approaches: "(1) ignore the deficiency and proceed with the review; (2) strike the brief or its offending portions; or (3) to review the issues raised in the brief for manifest injustice only, if the briefing deficiency pertains to the appellant's statement of preservation of error." *Swan v. Gatewood*, 678 S.W.3d 463, 469 (Ky. App. 2023), *discretionary review denied* (Dec. 6, 2023) (citation omitted).

Jones's brief offers two main arguments, alleging two different grounds upon which the trial court erred by denying his motion for a JNOV. Neither is explicitly prefaced with a preservation statement. Elsewhere, the brief *does* reference that Jones made these arguments to the trial court in a motion for judgment notwithstanding the verdict and also cites to where in the written record this motion appears.[4] Furthermore, Jones's brief mentions his having made a

---

[4] "The Court of Appeals is without authority to review issues not raised in or decided by the trial court." *Reg'l Jail Auth. v. Tackett*, 770 S.W.2d 225, 228 (Ky. 1989) (citations omitted).

contemporaneous request for a directed verdict, although it provides no citation for when this occurred.[5]

In this instance, we leniently elect to proceed with review. The McCrearys do not take issue with the lack of preservation statement in Jones's brief. Despite the extensive video record before us, the trial court's hearing on Jones's motion for a directed verdict is not difficult to locate. Nonetheless, we warn counsel to not expect such leniency in the future and urge counsel to scrutinize our basic appellate practice handbook.[6]

## STANDARD OF REVIEW

In our review of a trial court's denial of a motion for a JNOV or for a directed verdict, we have consistently recognized that the applicable standard of review is "a difficult one for an appellant to meet." *Est. of Moloney v. Becker*, 398 S.W.3d 459, 461 (Ky. App. 2013) (citing *Peters v. Wooten*, 297 S.W.3d 55, 65 (Ky. App. 2009)). Only where the trial court's decision is clearly erroneous may we disturb it. *Id.* (citing *Peters*, 297 S.W.3d at 65). As we have further stated:

> In ruling on either a motion for a directed verdict or a
> motion for a [JNOV], a trial court is under a duty to
> consider the evidence in the strongest possible light in

[5] "In order to rely on a claim of insufficiency of the evidence, a party must preserve it through a motion for judgment notwithstanding the verdict, which in turn must be predicated upon a directed verdict motion made at the close of all the proof." *Bryan v. CorrectCare-Integrated Health, Inc.*, 420 S.W.3d 520, 524 (Ky. App. 2013).

[6] *See* https://www.kycourts.gov/Courts/Court-of-Appeals/Documents/P56BasicAppellate PracticeHandbook.pdf (last visited Sep. 10, 2025).

-16-

favor of the party opposing the motion. Furthermore, it is required to give the opposing party the advantage of every fair and reasonable inference which can be drawn from the evidence. And, it is precluded from entering either a directed verdict or [JNOV] unless there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable [persons] could differ.

*Id.* (quoting *Taylor v. Kennedy*, 700 S.W.2d 415, 416 (Ky. App. 1985)).

In sum, we may reverse a trial court's denial of a directed verdict or JNOV only "when it is shown that the verdict was palpably or flagrantly against the evidence such that it indicates the jury reached the verdict as a result of passion or prejudice." *Id.* (quoting *Peters*, 297 S.W.3d at 65).

Where we must decide matters involving a trial court's rulings on evidentiary issues and discovery disputes, our standard is for an abuse of discretion. *Manus, Inc. v. Terry Maxedon Hauling, Inc.*, 191 S.W.3d 4, 8 (Ky. App. 2006) (citing *Sexton v. Bates*, 41 S.W.3d 452 (Ky. App. 2001); and *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575 (Ky. 2000)).

**Jones Has Not Established That The Trial Court Erred When Denying His JNOV Regarding the "Invoices."**

Jones argues that the trial court should have granted his motion for a JNOV and dismissed the McCrearys' claims against him as a sanction for fraudulently creating the "Invoices" and attempting to pass them off as true and accurate copies of invoices which had previously been sent to Jones. Jones

-17-

maintains that the McCrearys' admissions regarding the creation of the "Invoices" were in glaring conflict with the sworn endorsement of their discovery responses. Jones insists this unequivocally establishes that the McCrearys had committed perjury by submitting them during discovery. Accordingly, as a sanction, Jones alleges that the trial court should have granted a JNOV by striking the McCrearys' claims. He alleges the trial court committed reversible error when denying his motion to do so.

Viewed in a light most favorable to them, the McCrearys argue, there was ample evidence before the jury that the "Invoices" had not been generated or submitted in an attempt to present falsified evidence. The McCrearys maintain that any dispute regarding the "Invoices" was a question of fact fully appropriate for jury determination. They argue that two conflicting explanations of the "Invoices" were presented for consideration by the jury, who were appropriately tasked with weighing the evidence presented.

According to the McCrearys, the "Invoices" had not been submitted as falsified evidence but as a confidential communication at the request of their attorney. They contend Jones seized upon an admitted mistake of counsel during discovery, exaggerated and distorted its significance, and made the mistaken production of the "Invoices" by counsel the centerpiece of his case. Furthermore,

the McCrearys allege, this was a strategic decision to falsely portray them as scoundrels, which backfired.

The McCrearys' counsel represented that the "Invoices" were produced as a result of his request to the McCrearys that they put together a summary that might help him have a better understanding as to the work which had been performed on specific cars. The McCrearys testified that their attorney had requested they prepare a summary to assist in understanding their bookkeeping.

It is undisputed that the "Invoices" were created subsequent to the onset of litigation. Jones alleges that the McCrearys acted with intent to defraud during the discovery process. "Trial courts need not tolerate deliberate and willful discovery abuse[,]" and they are "afforded great leeway and discretion" in determining such matters. *Bramblett v. Penske Truck Leasing Co., L.P.*, 598 S.W.3d 567, 574 (Ky. App. 2019) (citing *Southern Financial Life Ins. Co. v. Combs*, 413 S.W.3d 921, 932 (Ky. 2013)). Here, however, the trial court did *not* find an abuse in the discovery process had occurred. Jones lists extensive citations to caselaw from multiple jurisdictions relating to dismissal of any action after a party has been found to have committed perjury or has falsified evidence. He presents extended arguments all foundationally premised on his insistence that the evidence unequivocally and unmistakably proved the McCrearys had generated

and tendered the "Invoices" with the intent to pass them off as their central proof in the case.

In addressing Jones's argument during his motion for a directed verdict, the trial court was not persuaded that Jones had unequivocally established perjury or intentionally fabricated evidence on the part of the McCrearys regarding the "Invoices[.]" The trial court concluded that there was sufficient evidence before the jury to support a contrary explanation – a simple misunderstanding on the part of the McCrearys as to what their counsel had requested when they were asked to provide a summary to help him understand what work was performed on which cars. Furthermore, the trial judge noted that for Jones's argument to succeed, it would require the trial court to *also* conclude that counsel for the McCrearys had not been candid before the court. To the contrary, the trial judge expressly found, he had surmised that counsel for the McCrearys *had* been candid in this explanation. Jones repeatedly asserted, as he does to this Court, that he did not dispute the explanation of counsel for the McCrearys. However, pressed by the trial judge as to how his allegations of perjury could be reconciled with this, Jones offered little explanation during his argument for a directed verdict.

Jones continues to focus his arguments entirely on his allegations that the McCrearys falsified and fraudulently submitted evidence. The McCrearys argue to this Court, as they did to the trial court, that no willful false testimony

occurred in their endorsement of the discovery responses. More important to Jones's appeal is that *the trial court* was not persuaded perjured testimony had occurred.

To this Court, Jones largely repeats the same argument offered to the trial court. Nowhere does he update his original argument to squarely allege error on the part of the trial court regarding the inconsistency of his allegations; in fact, he never squarely acknowledges that the trial court *made* this finding. He again notes that he does not dispute the explanation of counsel for the McCrearys but points to little in the McCrearys' testimony that is inconsistent or in conflict with this explanation. Jones simply alleges that the McCrearys lied to their counsel. This Court has no obligation to research or construct parties' arguments for them. *Hadley v. Citizen Deposit Bank*, 186 S.W.3d 754, 759 (Ky. App. 2005); *see also Curty v. Norton Healthcare, Inc.*, 561 S.W.3d 374, 379 (Ky. App. 2018) ("We will not search the record to construct [Appellant's] argument for her, nor will we go on a fishing expedition to find support for her underdeveloped arguments.").

Jones does not allege surprise from the testimony and evidence he complains of. Neither does he claim that the alleged false representations were only discovered subsequent to trial. As pointed out by the McCrearys, it was Jones who introduced the "Invoices" into evidence at trial and made them a centerpiece of his case. The McCrearys contend caselaw to which Jones cites largely

-21-

considered evidence which was discovered subsequent to trial to establish a judgment had been based upon false testimony. *Louisville & N.R. Co. v. Scarbrough*, 208 Ky. 79, 270 S.W. 494, 495 (1925); *Webb v. Niceley*, 286 Ky. 632, 151 S.W.2d 768, 769 (1941); and *Duncil v. Greene*, 424 S.W.2d 587, 588 (Ky. 1968).

The endorsement of the initial discovery responses by the McCrearys occurred in October of 2019, more than four years prior to the jury trial. Soon thereafter, counsel for the McCrearys explained that the "Invoices" had been mistakenly turned over and had been a confidential communication with counsel. Supplemental discovery responses conceded the "Invoices" had been created subsequent to the onset of litigation. The record indicates that depositions of the McCrearys were taken thereafter where counsel for Jones extensively examined them regarding the "Invoices" and the circumstances regarding their creation.

Jones introduced the "Invoices" at trial himself, apparently as a matter of trial strategy. From his opening argument forward, a central allegation Jones made to the jury was that the McCrearys had fabricated the "Invoices" with fraudulent intent, and this established that no other testimony or evidence offered by them should be believed. However, this was not the sole evidence before the jury.

At trial, Jason McCreary testified that he had generated the "Invoices" to summarize the amounts owed on the vehicles for the benefit of counsel after an early meeting. Jason McCreary testified that the amounts had been hastily calculated by reference to the books, along with his own memory and understanding, as the respective amounts attributed to any particular vehicle listed in the lien. Jason McCreary testified that he had not understood the discovery responses to be false or mistaken at the time he endorsed them. Although he conceded that he had approved and endorsed the discovery responses, he testified he was not aware the "Invoices" were being attached to them. He testified he considered the Notebooks to be the "Invoices" referenced in some of the responses.

During cross-examination about a reference in one Interrogatory response referring to "Invoices" that had been tendered to Jones, Jason McCreary testified he had interpreted that as a reference to the blank invoice forms for the garage that had been given to Jones. He had mailed blank invoice forms to Jones in the past, he testified, and had presumed the response referenced this. According to his testimony, Jason McCreary did not realize the "Invoices" would be attached to the responses; he insisted the "Invoices" had been given to his attorney, for his record only, so that counsel would better understand the garage's bookkeeping.

Neither the trial court nor, apparently, the jury were persuaded by Jones's arguments that the evidence unequivocally established that the McCrearys had perjured themselves and had created the "Invoices" with fraudulent intent. Given that the McCrearys were entitled to all reasonable inferences which might have been drawn from the evidence at hand, we cannot say that the verdict here was "'palpably or flagrantly' against the evidence so as 'to indicate that it was reached as a result of passion or prejudice.'" *NCAA by and through Bellarmine College v. Hornung*, 754 S.W.2d 855, 860 (Ky. 1988). Accordingly, we cannot say that the trial court erred in denying Jones's motion for a JNOV or for a directed verdict.

### Jones Has Not Established The Trial Court Erred When Denying His JNOV Regarding the "Errors" In David McCreary's Calculations.

Jones's second argument is similar to his first. He argues that the trial court should have granted a JNOV in his favor, awarding him the full amount he alleges he established he had overpaid the McCrearys, after their mathematical errors were corrected. Jones alleges that speculation and conjecture were required on the part of the jury to credit the McCrearys with the labor they claimed. Since the Notebooks were totally unreliable, Jones alleges, the jury could only have engaged in guesswork as to the labor hours that were actually worked on Jones's vehicles. That the jury declined to award him the amount he alleged he was

-24-

overcharged, and instead awarded the McCrearys the amount they claimed, Jones surmises this could only have been based on wholly insufficient proof.

The McCrearys argue that the jury was presented with two conflicting interpretations of the Notebooks. They argue the jury weighed competing evidence and appropriately rendered a verdict which did not require any conjecture or guesswork. Viewed in a light most favorable to the McCrearys, they argue, ample evidence to support the verdict was presented.

The McCrearys both testified the amount alleged in the Mechanics Lien had been calculated from David McCreary's bookkeeping in this notebook which accurately documented Jones's unpaid bills, in their estimation. David McCreary testified that the Original Notebook had been intended only for his own record keeping. He testified that its entries regarding labor were made contemporaneously at the close of each workweek at his garage. David McCreary testified that, while he did not always make a specific notation of how many men were working on Jones's vehicles that week, he could tell from the amount charged. In the typical entry that Jones complains of, where $3,600 was charged for 40 hours, David McCreary testified that the amount itself documented told him there were three laborers for that week. The labor calculations were recorded contemporaneously at the end of the respective workweeks when he was well aware of how many persons had worked on Jones's vehicles that week, he testified.

David McCreary insisted he would have charged only $1,200 where only one laborer had worked.

David McCreary also testified that his notations concerning payments received in the Original Notebook had been contemporaneously recorded; he added a notation for receipt of payment in the corresponding workweek entry as he received it. When a check came in the mail, he noted the date it arrived in the entry. He testified he was able to calculate which workweeks remained unpaid from the absence of a notation indicating payment had been received. He testified he had never charged Jones for any labor hours which had not occurred.

After hearing Jones's directed verdict argument regarding the alleged overpayment, the trial judge again concluded that allegation that the Notebooks were riddled with mathematical errors had not been established unequivocally. The trial judge noted that Jones's allegations as to bad faith on the part of the McCrearys as to the Notebooks had itself been inconsistent. Jones appeared to allege that both Notebooks were fraudulently concocted whole cloth after the onset of litigation. At some junctures, Jones appeared to imply that the Second Notebook had been fabricated in an effort to correct errors from the Original Notebook. However, well into the trial, Jones stipulated that the Second Notebook accurately reflected figures which had been transferred from the Original Notebook. Jones specifically conceded that there were no discrepancies between

them relevant to his allegations. Per this stipulation, the trial judge noted, "[t]he second, cliff notes version of notebook matched words and figures in the first notebook."

On Jones's motion for a directed verdict, the trial court did not accept his contention it had been unequivocally established that David McCreary's calculations were erroneous or fraudulent and cited to opposing evidence that had been presented by the McCrearys. The trial court noted that, while it had been conceded that the McCrearys had not used a standardized bookkeeping practice, they *had* rendered testimony which presented the jury with another explanation of the Notebooks. It was noted that, within the calculations Jones had cited, "sometimes the complete equation appeared, sometimes it did not." Additionally, the trial judge pointed out the testimony indicated that "the explanation was in the dollar figure itself." Furthermore, the trial judge noted, the McCrearys had offered line-by-line explanations as to how figures were arrived at during their testimony from a list of the disputed labor calculations. The trial court noted the McCrearys had repeatedly affirmed their contention that the figures were accurate during this testimony.

Jones continues to express incredulity about the credibility of the testimony the trial court cited. However, we agree with the McCrearys that assessment of the credibility or weight which should be given to this evidence was

the province of the trier of fact.  *Lewis v. Bledsoe Surface Min. Co.*, 798 S.W.2d 459, 461-62 (Ky. 1990).  We reverse a judgment on the ground that the trial court erred by failing to grant a motion for a directed verdict only in the most extreme circumstances.  *Id.*  We cannot say this case presents such circumstances.

After careful review of the arguments and the record, along with applicable law, we cannot say that the trial court clearly erred in denying Jones's motion for a JNOV.  Accordingly, we affirm the judgment.

## CONCLUSION

For the foregoing reasons, we affirm the Laurel Circuit Court's judgment.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

R. Aaron Hostettler
London, Kentucky

BRIEF FOR APPELLEES:

Liddell Vaughn
Louisville, Kentucky